## INMAN v. INMAN.
### No. 3135.

Court of Civil Appeals of Texas. El Paso.
March 14, 1935.

Rehearing Denied March 28, 1935.

Brame & Brame, of Sherman, for appellant.

Webb & Webb, of Sherman (G. P. Webb, of Sherman, of counsel), for appellee.

PELPHREY, Chief Justice.

In 1885 Thomas Inman, now deceased, was a widower with three small children. In that year he married appellee and they lived together as husband and wife until his death November 5, 1932. Appellant is one of the children of that marriage. During the time the marriage relation existed, Thomas Inman and appellee purchased the property involved in this suit. That property consisted of two different tracts, the first one being lots 1, 2, and 3, block 17, Chaffin's addition to the city of Sherman, Tex., on which the family residence is located, and lots 10, 11, and 12, block 14, of the same addition, on which some store property and another small residence was lo-

cated. The accompanying map will give a better description of lots 10, 11, and 12.

Prior to the death of Thomas Inman he and appellant formed a partnership and en-

gaged in the grocery business, occupying the store building as shown on the accompanying map. Thomas Inman left a will in which appellant was appointed independent executor. In said will Thomas Inman devised all his property to appellee.

This suit was instituted July 6, 1933, by appellee, alleging that appellant was refusing to surrender the above described property to her, to her damage in the sum of $50 per month.

Appellant answered by general demurrer and general denial and specially answered alleging that Thomas Inman's will provided that all his just debts be first paid out of his estate by the executor; that there existed and still exists debts against the estate aggregating $2,500; that the estate did not and does not have the money to pay said debts; that certain of said debts are secured by liens upon the real estate belonging to the estate; that said property with the exception of that used as a residence is not exempt, but is liable for the debts of the estate; that lots 10, 11, and 12, in block 14, were not the business homestead of Thomas Inman at the time of his death; that Thomas Inman did at one time use a portion of lot 12 as a business homestead, but ceased such use thereof on February 27, 1929; that he, appellant, is not holding or claiming any of said property in his individual capacity, but merely as executor of the estate and for the purpose of carrying out the provisions of the will of Thomas Inman, deceased.

At the conclusion of the evidence, the court instructed the jury to return a verdict for appellee for all of the property except a strip 38 feet wide and 80 feet long out of the second tract, same being out of the southwest portion of said tract and being occupied by the residence.

Judgment was rendered in accordance with such instructed verdict, and this appeal has resulted.

The controlling question in this case is whether or not lots 10, 11, and 12, block 14, were the business homestead of Thomas Inman at the time of his death.

Appellant's first contention is that the store building (what appears as "Grocery Store" on the map) was abandoned by Thomas Inman when he leased it to the partnership consisting of himself and appellant. In connection with this contention, appellant argues that the partnership was a legal entity distinct from the individual members composing it, and therefore use by the partnership would confer no homestead rights on the partners.

That homestead rights may be acquired in partnership property appears to have been the settled law of this state since Gordon v. McCall, 20 Tex. Civ. App. 283, 48 S. W. 1111. See, also, Williams v. Meyer (Tex. Civ. App.) 64 S. W. 66 (error refused); Allen v. Meyer (Tex. Civ. App.) 65 S. W. 645; Swearingen v. Bassett, 65 Tex. 267; Hall v. Morton (Tex. Civ. App.) 39 S.W.(2d) 903. It being uncontradicted that the store building was being used by the partnership at the time of Thomas Inman's death, there was no abandonment shown, and the court properly instructed a verdict for appellee in so far as it was concerned.

Appellant's second proposition relates to the sufficiency of the evidence to show the barn or warehouse to be a part of the business homestead of Thomas Inman at the time of his death.

Mrs. Inman, the widow of Thomas Inman, testified:

"Q. Would you call it a small barn? A. Yes, sir; it is a barn that we used for feed. * * *

"Q. In connection with your store? A. Yes, sir.

"Q. And did you sell some feed in connection with the store? A. Yes, sir. * * *

"Q. Now your husband sold merchandise, feed stuffs, and such as that? A. Yes, sir, groceries and feed stuffs. * * *

"Q. What other uses was the barn put to, if any? A. We didn't use it for anything else particularly. * * *

"Q. Now you say there was a part of the barn there that had been at times used as a market? A. No, sir, not used as a market.

"Q. Well, what had it been used for? A. We stored feed in it.

"Q. That has never been used as a market? A. No, sir, not any part of it. * * *

"Q. Now the building on the North end, right next to the alley, that we called 'Warehouse,' I believe you called it a barn? A. Yes, sir.

"Q. An effort had been made to rent it, had there not? A. Not exactly—I spoke of selling it, but I didn't sell it because he was renting it—

"Q. I know, but before your husband died, during his lifetime, the lifetime of Thomas Inman, an effort had been made to rent that barn, had there not? A. Yes, sir, and to sell it too.

"Q. And it was not being used by Mr. Inman for some time before he died? A. There was something stored there, I forget just what, as well as I remember there was something stored there.

"Q. Among other things there was some furniture and fixtures belonging to the East Sherman Baptist Missionary Association? A. There was something of that kind for a while, yes.

"Q. And it wasn't used in connection at that time with the store, was it? A. I don't know as it was, if they wanted to put anything in there I suppose they could put it in there. * * *

"Q. But it didn't have anything to do with the store at that time? A. It did have if they wanted it to.

"Q. As a matter of fact for the past few years prior to Mr. Thomas Inman's death they did not carry much of that feed stuff in the store, did they? A. No, sir, they had to store it in the barn. * * *

"Q. They had feed stuff stored in the barn? A. Not all the time, I don't remember whether they had it stored in there all the time or not.

"Q. Well, Mrs. Inman, all of the time that they were running the store there, they had some things stored in the barn on the Inman property there? A. Not all the time, I don't think so.

"Q. I am not talking about feed stuff now, was there anything else stored there? A. Well of course the church had things stored there you understand.

"Q. Well, was there anything else in the barn besides that? A. There might have been some things stored in the barn.

"Q. Well, what was the barn built for, at the time it was built? A. It was built to use as a feed house for feed stuffs."

Jim Inman, one of the sons of deceased, testified:

"Q. Now, Jim, you are acquainted with the barn at the rear or at the back of the lot there? A. Yes.

"Q. Do you know what was kept in that barn, at the time your father died, or for a time previous thereto? A. A place for trucks.

"Q. Alright, what trucks did they keep in there? A. The store truck was kept in there, and cars. A coal-oil tank had been there.

"Q. And used in connection with the store? A. Yes, sir.

"Q. Alright, what else? A. Well, a pair of old scales was in there, that they weighed charcoal on. * * *

"Q. In addition to that they had some furniture from some church, didn't they? A. There was a little old furniture, and a stove that was taken out of one of the old houses over there, and put in there, it didn't amount to nothing."

Benjamin Inman, another son, testified:

"Q. Now, do you know what they usually stored in that barn, at the time your father died? A. Well, yes, sir, there were a few automobile parts— * * *

"Q. And was it used for trucks, or anything like that? A. Yes, some truck parts, and things like that. * * *

"Q. What else was stored in there? A. A pair of old scales.

"Q. What else? A. That is all I remember."

Had the above been the only evidence on the question of the abandonment of the barn or warehouse as a part of the business homestead of Thomas Inman, the court might have been justified in finding there had been no abandonment of the barn as a part of the business homestead, but, appellant, as to the use of the barn, said:

"Q. Now, for what use was that building held at the time of your father's death? A. I don't know—I don't know as it was held for anything, we used it for a while years ago, as a storehouse. * * *

"Q. Can you tell the jury just what it consisted of, that store-house? A. We used it for feed and stuff like that, it has been something like eight or ten years ago, we quit handling feed and coal and stuff like that.

"Q. And after that got unpopular you ceased to do that, and had no further use for it, for store purposes? You just used it for storing feed for a while? A. Yes, sir.

"Q. Then what use was it put to? A. It was for sale for a long while.

"Q. It was for sale a long while? A. Yes, we had a pair of old scales in there that we didn't have any use for, and we throwed them back in there, and an oil tank, we throwed it out there.

"Q. Those scales and tank were not used in connection with the store building, that is the grocery store, at any time? A. No, sir.

"Q. They were put back in there—in other words you discontinued the using of the scales and the little oil tank, and put them

back there? A. The little oil tank was rotting out at the bottom, and we stored it back at the back end of that barn, we didn't use the oil tank or scales."

We think it clear that the above was sufficient to raise an issue on the question of abandonment, and that the court was in error in giving the peremptory instruction in so far as this building and the land on which it was situated was concerned.

■ The awarding of the meat market is also attacked.

The evidence as to its use is:

Mrs. Inman:

"Q. Now this store had a meat market in connection with it? A. Yes, sir.

"Q. Had a meat market to the West of it, joining part of it, did it? A. Yes, sir, he rented it.

"Q. There was a partition, wasn't there, between the store and the meat market? A. No, sir, it joins onto the store.

"Q. Was there a door opening from the store into the meat market? A. No, sir, the door opened into the back of the meat market, and on the side there, right there (indicating).

"Q. How long has the market been attached to the other building? A. Twenty-five years I suppose, I do not know how long, but I suppose it has been that long.

"Q. You used that part of the time, and rented it part of the time? A. Yes, sir.

"Q. What use did you put that to when you used it? A. The fact is we did not use it so much, but it was there, and when we wanted to store anything in it, we used it.

"Q. You used it as a store house part of the time, and rented it as a meat market part of the time? A. Yes, sir.

"Q. You used it as a store house in connection with the store you were running there? A. Yes, sir. * * *

"Q. Now they (referring to Thomas Inman and appellant) had not operated the meat market in the little building, had they? A. My husband rented that out for a meat market. * * *

"Q. Is the West wall of the store building, or the East wall of the meat market building the same? A. I think it is.

"Q. There is just one wall for both of the stores? A. Yes."

Jim Inman:

"Q. Now what is that or was that market used for, before it was converted into a market? A. It was a feed room, was used to put shorts, bran, chops, and things of that kind in, when my father and Mr. Evans were partners in the store.

"Q. Your father and Mr. Evans were partners a long time were they? A. Yes. * * *

"Q. And the market was a part of the store there? A. Yes, sir.

"Q. And used as a feed bin? A. Just as a feed room then.

"Q. Then your father bought out Mr. Evans and ran the store by himself? A. Yes, sir.

"Q. And fixed up the place, and made a meat market out of it? A. Yes, sir.

"Q. Who ran the first meat market? A. I believe Joe Brown was in there, and then Charley Inman, my brother, and then after that it was a store room there and used for first one thing and another.

"Q. How long before your father died had it been used as a store room, and not a market? A. Well, a good long time, I do not know just how long it had been used as a store room.

"Q. At the time your father died it had not been used as a market for a long time? A. No, sir, it had not.

"Q. It had been used as a store room? A. Yes, sir. * * *

"Q. Now, that market, how many years has it been since that has been rented? A. I don't know about the length of time, Spearman—I haven't kept up with it, it has been a good many years. * * *

"Q. There is no door in the West wall, and no door between the market and the store? A. No, sir.

"Q. It was originally used in connection with the store at first, for a good many years was it not? A. Yes, sir.

"Q. And what use did they put it to at first? A. For storing feed, stock feed and stuff.

"Q. Now when it was first opened up you say they kept feed out there, then your father ran a meat market there did he? A. No, sir, not during the time they had the market in there, I don't remember about that.

"Q. But you do remember they did use it part of the time for feed stuffs for the store? A. Yes, sir.

"Q. There is just one other question, after he used it for feed stuff, then it was used as a market? A. It stood vacant for a while, then they used it for a market.

"Q. They rented it to other people for a market? A. Yes.

"Q. And your father never used it then before that, except for feed, and that was before it was rented for a market? A. Yes, sir."

M. Virgil Inman:

"Q. Now with reference to that shed, I believe you referred to it as another building —with reference to it, what was it used for? A. It was rented out for a meat market.

"Q. Now did the firm of Thomas Inman and Son, being a partnership composed of yourself and father, use or occupy that other store building on the property? A. Just before my father's death?

"Q. Yes, sir? A. It was vacant.

"Q. How long had it been vacant? A. I don't know just how long, it stood idle for quite a while, it might have had some furniture, or some thing another in there, when we wanted to put it in there, something we didn't want in the store.

"Q. And it was not used in connection with the store? A. No, sir. * * *

"Q. Do you remember when what you call the back part of the building was used as a feed bin, or a feed place in connection with the store? A. No, sir, I do not.

"Q. You do not remember that? A. No, sir, it may have been along in '25 or '28, some years ago possibly, I remember that it had been rented, but it has been a market for ten or fifteen years. * * *

"Q. Now, Virgil, he asked you whether or not your father charged Thomas Inman & Son rent on the little market, the building adjoining the store building that you occupied there, and I understood you to say that he did not charge you any rent? A. No, sir, he didn't charge Thomas Inman and Son any rent, because he didn't have possession, what I mean is, it was rented out.

"Q. You didn't occupy the building? A. No, sir."

Charley Inman:

"Q. Do you remember what that annex was for, what it was used for? A. A market.

"Q. How long ago? A. It has been a long while ago, I imagine about twelve or fifteen years ago, I don't know just how long but I know they had it there.

"Q. Did your father have a meat market there? A. No, sir, he rented it out.

"Q. Did you know what use was made of it before that? A. It was used for a feed room before that."

Appellee asserts that this evidence shows the side building or meat market to be only a room to the main building, and that the fact that it had been rented out to others at times would not alter its status as a part of the business homestead. It appears that while one wall was common to both the store and the market, yet there was no door connecting the two buildings, and that the market building was capable of being used as a place of business entirely independent of the main store building. These facts are entirely different from those in Brennan v. Fuller, 37 S. W. 64, cited by appellee, and the holding there will not control the disposition here.

■ Under all the facts, we have concluded that as to the market building there was an issue of fact which should have been submitted to the jury for its determination. As to whether the driveway was being used in connection with the business, the evidence is not complete, but there also appears to be a conflict as to whether or not its use as part of the homestead has been abandoned.

The judgment, in so far as it disposes of the barn or warehouse, the meat market building and the driveway, is reversed, and the cause remanded. In all other respects, it is undisturbed.